# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

ROBERT W. LAROCHE, JR., Individually
and as Administrator of the Estate of his wife,
KASSONDRA N. LAROCHE, Deceased,

    Plaintiffs,

    v.

CSX TRANSPORTATION, INC.,

    Defendant.

CV 513-86

## ORDER

Kassondra LaRoche died in a car accident after she traversed Defendant CSX

Transportation's railroad crossing at Trudie Road in Brantley County, Georgia. Plaintiff Robert

LaRoche, Kassondra's husband and administrator of her estate, claims that a dangerous "ramp

effect" in the crossing caused the fatal accident. Defendant CSXT has moved for summary

judgment (Dkt. no. 47), arguing that it is not liable for the accident as a matter of law. However,

the record evidence presents material questions of fact as to Defendant's alleged negligence, and

these questions must be resolved by a jury. Defendant's Motion for Summary Judgment (Dkt.

no. 47) is **DENIED**.

## FACTUAL BACKGROUND

In considering Defendant's Motion for Summary Judgment, the Court views all of the

evidence in the light most favorable to the Plaintiff and draws all reasonable inferences in his

favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

Many facts presented here are drawn from the Parties' statements of fact and Plaintiff's expert

affidavits. Defendant objected to dozens of individual paragraphs in those documents. Rather than address each individual evidentiary contention to an underlying fact as it is recounted here, that discussion is included in an Appendix to this Order. This statement of facts, then, takes into consideration Defendant's objections and whether those objections were sustained or overruled, as discussed in the Appendix.

### *The Accident*

On September 14, 2011, Kassondra LaRoche was traveling west on Trudie Road in a Ford F-150. According to the traffic crash report, Mrs. LaRoche crossed the railroad crossing "at a high rate of speed." The truck then went airborne and traveled about 20 feet in the air before landing on the road. The landing caused the truck to rotate, and it drifted onto the shoulder and eventually struck a railroad grade crossing sign. From there, the truck went another 100 feet and crashed into a tree. Dkt. no. 50-5, p. 119. Mrs. LaRoche had to be cut from the truck with the "Jaws of Life," and died later that day from blunt force trauma. Dkt. no. 64 ("Cummings Aff."), ¶ 13.

Trooper Meeks, the Georgia State Patrol Officer who responded to the accident and completed the traffic crash report, said that he determined the truck went airborne by the distance between the hillcrest of the railroad crossing and the marks the truck's frame gouged into the road. Id. at 14:1-6. In the report, Trooper Meeks judged that Mrs. LaRoche had been driving "too fast for conditions." Id. p. 119. One of Plaintiff's experts, based on his investigation of the accident scene, determined that Mrs. LaRoche was going 53.6 miles per hour when she traveled over the CSXT crossing. Cummings Aff. ¶ 17. The accident occurred around 8:45 in the morning, with clear skies and a dry road. Dkt. no. 50-5, p. 118. Both parties admit that there are no posted speed limit signs in the westbound direction of Trudie Road near the crossing. See

Dkt. no. 60 ("Pl.'s SOF"), ¶¶ 13, 14; Dkt. no. 70 (Def.'s SOF Objs.") (no objections to these statements).[1]

### Mrs. LaRoche's Prior Experience at the Trudie Road Crossing

Mrs. LaRoche had crossed the Trudie Road crossing at least once before. Mrs. LaRoche's mother, Tina Smith, deposed that about four years prior to the accident, she drove Mrs. LaRoche as a passenger on Trudie Road. Dkt. no. 50-6, 77:19-22, 79:4-8. When they crossed the track, Mrs. Smith said "that's a horrible railroad track, they need to fix this." Id. 78:4-5. Mrs. Smith does not remember if Mrs. LaRoche responded to this statement. Id. 79:9-12. She also does not remember what specifically about the crossing was "horrible," she just recalls that the crossing was "really, really bad." Id. 78:18-22.

### The Crossing

Defendant CSXT owns a 150 foot right of way that encompasses the Trudie Road crossing and extends 75 feet on each side of the tracks. Pl.'s SOF ¶¶ 10, 11. Defendant CSXT had contracted with Waycross Paving Company on at least two separate occasions to do some work on the Trudie Road crossing. See Dkt. no. 61 ("Johns Aff."), ¶ 14. Randy Johns was the foreman for the Waycross Paving crew on both occasions. Id. The work included removing and replacing the existing asphalt at the crossing so that CSXT could remove and replace the railroad ties. Id. ¶¶ 18-20. Johns was present when Waycross Paving performed this work in 2000 and 2009. Id. ¶ 28.

---

[1] Many of Plaintiff's Statements of Material Fact are supported by numerous documents. For ease of reference, the Court will cite only to the Plaintiff's Statement of Material Facts (Dkt. no. 60) where Defendant has not objected to that particular statement. Thus, the reader may assume that, for the remainder of this Order, any assertion of fact supported only by a citation to Plaintiff's Statement of Material Facts is undisputed. See Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); LR 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.").

After the work was completed in 2000, Johns says that he told CSX Roadmaster David Ambrose that the approach on both sides of the crossing "was too steep because the crossing was too high relative to the roadway, which caused a ramp effect that was dangerous to motorists driving their vehicles over the crossing." Id. ¶ 31. This ramp effect existed within CSXT's right of way, within its crossing, and within two feet of the rails at the crossing. Pl.'s SOF ¶ 35. As CSX Roadmaster, Ambrose was responsible for the safety of the Trudie Road crossing. Pl.'s SOF ¶ 47. Johns explained to Ambrose that CSXT could eliminate the ramp effect by adding asphalt to the roadway surface on both sides of the crossing to reduce the height differential between the roadway and the crest of the crossing. Johns Aff. ¶ 50. Johns specifically requested that Ambrose give Waycross Paving authority to apply about 100 additional feet of asphalt to the roadway leading up to the crossing. Id. ¶ 52. Ambrose, however, only authorized Waycross Paving to charge CSXT for an additional 50 feet of asphalt on both sides of the Trudie Road crossing. Id. ¶ 54. When Waycross Paving conducted similar work at the Trudie Road crossing in 2009, Johns says he reiterated to Ambrose the need to correct the ramp effect at the crossing. Id. ¶ 46. Johns says that, again, Ambrose refused the request. Id. ¶¶ 47-48. For his part, Ambrose denies ever having these conversations with Johns. Dkt. no. 50-3 ("Ambrose Dep."), 117:18-118:13.

### Expert Opinions on the "Ramp Effect"

Plaintiff solicited the testimonies of three experts to discuss the "ramp effect" at the Trudie Road crossing. Specifically, engineers Alfred Amos and Augustine Ubaldi discussed the design of the Trudie Road crossing and whether or not it met industry standards. Dr. Jeremy Cummings, a biomechanical engineer and accident reconstructionist, discussed the human factors that contributed to the accident.

AO 72A
(Rev. 8/82)

Amos states that surfacing and other maintenance work at a railroad track typically results in the rails being raised over time. Dkt. no. 63 ("Amos Aff.") ¶ 31. He discusses various industry standards for rail crossings and concludes that "the CSXT crossing on Trudie Road did not meet the minimum requirements recommended by AREMA, the GDOT Manual, and CSXT's own MWI standards, for such 'humped' crossings." Id. ¶ 37. For example, Amos measured that the surface of the roadway was 7.5 inches lower than the rail at a point 30 feet east (i.e., from the direction Mrs. LaRoche was traveling) of the outermost rail. Id. at ¶ 47. However, CSXT's own standards for rail crossings recommends that "the surface of the highway should not be more than three inches higher or lower than the top of the nearest rail at a point 30 feet from the rail . . . ." Id. ¶ 60. Amos opines "that the track being [7.5] inches higher than the roadway at a point thirty (30) feet east of the track created an extremely dangerous 'ramp effect,' which existed at the time of Mrs. LaRoche's death." Id. ¶ 51. Further, Amos believes that "the work required to make the crossing safe, namely the laying of additional asphalt, could have been performed entirely within the existing one hundred fifty (150) [foot] CSXT Right of Way . . . ." Id. ¶ 66. Ubaldi's opinions (Dkt. no. 65) discuss the same standards, and reach the same conclusions, as Amos's.

Dr. Cummings discussed the "human factors" that contributed to the crash. See Dkt. no. 64 ("Cummings Aff."). He believes that the railroad crossing was the proximate cause of Mrs. LaRoche's accident. Id. ¶ 15. Specifically, he believes that Mrs. LaRoche could not have anticipated the precipitous ramp at the crossing, and thus would not have known that she needed to slow down to traverse it safely. Id. ¶ 24. Thus, her impact with the crossing ramp resulted in a "violation of expectation" that contributed to the accident. Id. ¶ 21. Dr. Cummings concludes that after Mrs. LaRoche was launched into the air, the force of her impact on the road when she

landed would have been great enough to cause her to lose consciousness. Id. ¶ 19. "This opinion is supported by the fact that there was no evidence that Mrs. LaRoche attempted to steer the F-150 back onto the road after it went off the road into the grass." Id.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson, 234 F.3d at 507.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

**DISCUSSION**

I.    **Defendant's Liability for Negligence**

    a.  **Defendant Owed a Duty to Mrs. LaRoche**

"In order to have a viable negligence action, a plaintiff must satisfy the elements of the

tort, namely, the existence of a duty on the part of the defendant, a breach of that duty, causation

of the alleged injury, and damages resulting from the alleged breach of the duty." Diamond v.

Dep't of Transp., 756 S.E.2d 277, 281 (Ga. Ct. App. 2014). In Georgia, a "threshold issue in a

negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff."

McGarity v. Hart Elec. Membership Corp., 706 S.E.2d 676, 679 (Ga. Ct. App. 2011). This is a

question of law. Barret v. Ga. Dep't of Transp., 697 S.E.2d 217, 219 (Ga. Ct. App. 2010). Duties

may arise either by common law or by statute. Diamond, 756 S.E.2d at 281.

    i.  **Duty by Statute**

Plaintiff has pointed to three statutes which he says impose a duty on Defendant. These

are Georgia Code Annotated sections 32-6-190, which regulates the "maintenance of grade

crossings," 51-3-1, which governs a landowner's duty to invitees, and 51-3-2, which governs a

landowner's duty to licensees.

    1.  **§ 32-6-190**

Under Georgia Code Annotated section 32-6-190,

> Any railroad whose track or tracks cross a public road at grade shall have a duty
> to maintain such grade crossings in such condition as to permit the safe and
> reasonable passage of public traffic. Such duty of maintenance shall include that
> portion of the public road lying between the track or tracks and for two feet
> beyond the ends of the crossties on each side and extending four feet beyond the
> traveled way or flush with the edge of a paved shoulder, whichever is greater, of
> such crossing.

Ga. Code Ann. § 32-6-190. Because the Trudie Road crossing is an at-grade crossing, Defendant had a duty to maintain the crossing so that the motoring public could safely and reasonably cross, and this duty extended "at the very least" two feet in either direction from the outside tracks. See Easterwood v. CSX Transp., Inc., 933 F.2d 1548, 1557 (11th Cir. 1991).

The Parties dispute how wide of a corridor Defendant is duty-bound to maintain in a reasonably safe condition. On one hand, Defendant argues that, by its plain language, section 32-6-190 limits its duty to the space extending two feet beyond the end of the crossties. See Ga. Code Ann. § 32-6-190; Beacon Med. Prods., LLC v. Travelers Cas. & Sur. Co. of Am., 665 S.E.2d 710, 712 (Ga. Ct. App. 2008) ("If the statutory language is plain and does not lead to absurd results, we must construe the statute according to its terms without further inquiry."). On the other hand, Plaintiff argues that Defendant's duty actually extends to an area further beyond the ties. In holding that the statutory duty under section 32-6-190 extends "at the very least" two feet in either direction from the outside tracks, the Eleventh Circuit noted that the "statute strongly implies that the duty may extend beyond the two feet mentioned in the statute." Easterwood, 933 F.2d at 1557 n.8. Similarly, Georgia DOT Policy 6865-8 discusses the application of section 32-6-190, and states:

> On future Railroad maintenance, it is reasonable to expect the Railroad's duty to extend beyond the "two feet beyond the crossties" limits as stated in O.C.G.A. Section 32-6-190 in order to provide a safe and reasonable passage for the traveling public. (For example, if a railroad raises their rail, it is reasonable to expect the railroad to extend their work beyond the 2 feet beyond the ends of the crossties.)

Policy 6865-8: Railroad Maintenance of Grade Crossings on the State Highway System, p. 1 (available at Dkt. no. 60-6). CSXT's own internal policies also contemplate that paving work may extend beyond two feet past the crossties. In a provision that would impact the degree of a slope approaching a crossing, one policy notes that "[t]he surface of the highway should also not

AO 72A
(Rev. 8/82)

be more than 3 in. higher or lower than the top of the nearest rail at a point 30 ft. from the rail unless superelevation makes a different level appropriate." Dkt. no. 60-4, p. 2 ("MWI 901-05").

Defendant counters that the GDOT policy is merely a directive intended "to provide guidance in matters relating to the maintenance of grade crossing surfaces," and is thus not binding on CSXT. See id. It also argues that the internal policy, MWI 901-05, does not apply to the surfacing work performed in 2000 and 2009. In Georgia, a violation of mandatory regulations may amount to negligence *per se*. Hubbard v. Dep't of Transp., 568 S.E.2d 559, 566 (Ga. Ct. App. 2002). However, the Court is not convinced that the non-binding policies in this case have no bearing on the question of Defendant's duty. A duty can be defined by statute—"negligence *per se*"—or by "the general standard of reasonable care to avoid harm." Ga. Cas. & Sur. Co. v. Salter's Indus. Serv., Inc., 734 S.E.2d 415, 419 (Ga. Ct. App. 2012). The policies, then, may not extend Defendant's duty in this case more than two feet beyond the ties as a matter of law, but they could nevertheless inform the question of whether Defendant had a "general," non-statutory duty to perform its maintenance work on the Trudie Road crossing with reasonable care. This reasoning follows the spirit of Georgia's rule that "[p]rivately established rules are admissible as illustrative of negligence, but the violation of such a rule is not negligence in and of itself." Luckie v. Piggly Wiggly S. Inc., 325 S.E.2d 844, 845 (Ga. Ct. App. 1984). The publicly established GDOT policy, along with CSXT's privately established internal policies, may thus illustrate what constitutes negligence in maintaining a grade crossing.

However, the Court need not determine whether Defendant's duty extends more than two feet past the ties at this juncture because Defendant has conceded, for purposes of summary judgment, that the "ramp effect existed within CSXT's right of way, within its crossing *and within two feet of the rails at the crossing.*" Pl.'s SOF, ¶ 35 (emphasis added); see also Def.'s

SOF Objs. (making no objection to ¶ 35); LR 56.1 (a party's statement of facts are "deemed to be admitted unless controverted by a statement served by the opposing party."). Defendant had a statutory duty to maintain the Trudie Road crossing such that traffic could safely pass. That duty extended to the area at least two feet beyond the ties. The facts, when considered in a light most favorable to Plaintiff, might suggest that Defendant breached this duty.

## 2. §§ 51-3-1 and 51-3-2

In Georgia, owners and occupiers of land are required by statute to keep premises safe for invitees:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

Ga. Code Ann. § 51-3-1. This statute, by its terms, only applies to invitees. "The 'accepted test' for invitee status in Georgia is whether the purported invitee's presence is of 'mutual benefit' to the purported invitee and the landowner." Tobar v. United States, 696 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009).

Here, Mrs. LaRoche was not an invitee. Defendant did not induce her to cross its track, and there was no mutual benefit to that crossing. Instead, Mrs. LaRoche was a licensee, which is defined under Georgia law as a person who "(1) Is neither a customer, a servant, nor a trespasser; (2) Does not stand in any contractual relation with the owner of the premises; and (3) Is permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience, or gratification." Ga. Code Ann. § 51-3-2. "The owner of the premises is liable to a licensee only for willful or wanton injury." Id. "Willful conduct is based on an actual intention to do harm or inflict injury." Ga. Dep't of Transp. v. Strickland, 632 S.E.2d 416, 418 (Ga. Ct. App.

2006). Wanton conduct is that "which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." Id. Further,

> Although a landowner owes a duty to use ordinary care to protect anticipated licensees from dangerous activities being conducted on the premises or from hidden perils, where the alleged negligence arises from a dangerous static condition on the premises, the duty remains not to injure the licensee willfully or wantonly.

Rice v. Elliott, 567 S.E.2d 721, 722 (Ga. Ct. App. 2002).

The evidence here would not support a finding that Defendant intended to do harm to Mrs. LaRoche, and thus acted willfully. However, there is evidence in the record that could suggest Defendant acted wantonly as to its creation of the static ramp effect. Particularly, the purported conversations between Mr. Johns and Mr. Ambrose could suggest that Defendant knew of the dangerous ramp hazard at the Trudie Road crossing but nevertheless chose not to mitigate the ramp effect. It will be for a jury to determine whether these conversations actually occurred and, further, whether they display conduct that "is so reckless or so charged with indifference as to the consequences as to be the equivalent in spirit to actual intent." See Strickland, 632 S.E.2d at 418.

Thus, there are material questions of fact as to whether or not Defendant had a statutory duty to keep the Trudie Road crossing in a safe condition for drivers under both Georgia Code sections 32-6-190 and 51-3-2.

### ii. Duty by Common Law

While it is clear that Defendant had a duty to Mrs. LaRoche under various Georgia statutes, it is also worth noting that it had a duty to her under Georgia common law.

In Georgia, a landowner is liable for physical harm a licensee suffers because of a condition on the land if, "but only if,"

> (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk involved.

Tollman v. Zamani, 481 S.E.2d 232, 234 (Ga. Ct. App. 1997). "Where a licensee has *equal knowledge* of the dangerous condition or the risks involved, there is no willful or wanton action on the part of the owner and there is no liability to the licensee." Id. (emphasis in original).

Here, there is ample evidence that Defendant knew or had reason to know of the allegedly dangerous ramp condition. The purported conversations between Mr. Johns and Mr. Ambrose would establish that Defendant knew of the ramp effect at the Trudie Road crossing. Furthermore, Defendant's own internal policy that the tracks at grade crossing should not be more than three inches higher than the highway 30 feet away from the tracks suggests that it knew what would constitute a "safe" crossing. Furthermore, the totality of Plaintiff's admissible expert testimony strongly suggests that Defendant failed to take the appropriate actions to correct this hazard. And while a crossbuck sign warned motorists that they were approaching, nothing about these warnings put Mrs. LaRoche on notice that the ramp was so precipitous that it might launch her into the air.

Whether or not Mrs. LaRoche had knowledge of the hazard equal to Defendant's is less clear. Defendant has produced evidence that Mrs. LaRoche traversed the crossing some four years before her accident, as a passenger, and was told that the crossing was "rough." There is no evidence that Mrs. LaRoche herself ever crossed over the tracks as a driver. However, again, the evidence of the conversations between Mr. Johns and Mr. Ambrose show that Defendant knew that the ramp approaching the track at Trudie Road was too steep for safe motor travel, and that it knew exactly how much asphalt would be necessary to lessen the grade to a safe level. Surely,

AO 72A
(Rev. 8/82)

a reasonable juror could determine that Mrs. LaRoche's possible knowledge that the crossing was "rough" was not "equal to" Defendant's knowledge of the specific grade of the ramp and its potential consequences.

Thus, in addition to the statutes discussed above, Defendant had a duty to Mrs. LaRoche under Georgia's common-law doctrines of a landowner's duty to licensees. However, whether or not Defendant breached that duty and thereby caused Mrs. LaRoche's and Plaintiff's injuries will be questions for the jury.

### b. Whether Plaintiff's Claims are Barred by the Doctrine of Avoidable Consequences is a Matter for the Jury's Consideration

CSXT argues that, to the extent it owed any duty to Mrs. LaRoche, Plaintiff cannot recover for any injuries Mrs. LaRoche sustained in the accident because she could have easily avoided the accident. Additionally, Defendant argues that Mrs. LaRoche was traveling too fast over the crossing in violation of Georgia law.

In Georgia, "[i]f the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover." Ga. Code Ann. § 51-11-7. "The defendant has the burden of proving that the plaintiff by ordinary care could have avoided the consequences caused by the defendant's negligence." Reed v. Carolina Cas. Ins. Co., 762 S.E.2d 90, 96 (Ga. Ct. App. 2014). "Except in plain, palpable and undisputed cases where reasonable minds cannot differ as to the conclusions to be reached, questions of . . . lack of ordinary care in avoiding the consequences of another's negligence . . . are for the jury." McCray v. FedEx Ground Packages Sys., Inc., 661 S.E.2d 691, 695 (Ga. Ct. App. 2008).

Defendant argues that the crossing itself was a "static" condition, or "one that does not change and is dangerous only if someone fails to see it" before coming upon the danger. See Becton v. Tire King of N. Columbus, Inc., 539 S.E.2d 551, 553 (Ga. Ct. App. 2000). Where

nothing obstructs a party's ability to see the static condition, a landowner may assume that the party will see it and appreciate any accompanying risks. See id. Furthermore, if a party has previously "successfully negotiated" a dangerous static condition, that party is presumed to know of the danger and is estopped from recovering for a later injury resulting from the condition. Barton v. City of Rome, 610 S.E.2d 566, 569 (Ga. Ct. App. 2005). But the injured party's mere knowledge of "generally prevailing hazardous conditions or of hazardous conditions" which that party avoids will not impute knowledge of the danger to the plaintiff—rather, the plaintiff must know of the "specific hazard precipitating" her injuries to be estopped from recovering. See id. at 569-70. Indeed, summary judgment is not appropriate where the record does not "clearly substantiate that the plaintiff had 'successfully negotiated' the hazard." Id. at 570 (quotations omitted).

Here, Defendant has not clearly established either that Ms. LaRoche could have avoided her accident by exercising ordinary care or that she had successfully negotiated the crossing on a prior occasion.[2] CSXT suggests that because the crossing itself was in plain view on a clear day and was candidly identified with the appropriate signage and pavement markings, an ordinarily prudent person from Ms. LaRoche's advantage would have been able to anticipate and avert the inherent danger of the crossing. But CSXT's focus on the general dangers of railroad crossings is misplaced. The appropriate focal point in this case is the "specific hazard precipitating" Ms. LaRoche's fatal accident, which was the allegedly sharp incline and "ramp effect" at the crossing. It may behoove a person of ordinary prudence to keep an eye out for approaching or parked trains near a well-marked and visible railroad crossing. However, the fact that a crossing is static and visible does not, in and of itself, compel the ordinarily prudent individual to examine

---

[2] The "successful negotiation" analysis here is based on the same facts, and draws the same conclusion, as the "equal knowledge" analysis in Part I.a.ii above. The Court repeats the analysis nevertheless, as the two appear to be distinct, albeit overlapping, analyses.

AO 72A
(Rev. 8/82)

the approach to the crossing for any indication that the slope may be too steep to safely traverse at the appropriate speed. Even assuming an ordinarily prudent person could appreciate the ramp effect that mere inches in a crossing's elevation can create, CSXT has proffered no evidence that such a person could discern the "unsafe" elevation when approaching the crossing.

Additionally, even though there is evidence in the record that Ms. LaRoche had crossed the Trudie Road crossing as a passenger, there is no evidence that Ms. LaRoche herself "successfully negotiated" that crossing on a prior occasion. Passengers are passive. They do not need to scan the road ahead, anticipate changes in road conditions, or make judgments as to the best way to approach an obstruction or crossing. As such, a passenger's experience at a particular crossing will not necessarily prepare her to later navigate the crossing as a driver. Such issues are better suited for jury resolution.

Furthermore, Defendant's argument that Mrs. LaRoche was traveling too fast over the railway crossing as a matter of law is not supported by the evidence. Georgia Code section 40-6-140 requires drivers approaching a crossing without a gate or stop sign to "slow to a reasonable and prudent speed and verify that there is no approaching train prior to proceeding." Ga. Code Ann. § 40-6-140(c). A "'reasonable and prudent speed' means a speed slow enough to enable the driver to safely stop the vehicle prior to reaching the nearest rail of such a crossing." Id.

Even assuming the statute should inform the examination of Mrs. LaRoche's own conduct under these circumstances, there is conflicting evidence on whether or not her speed was "reasonable." Trooper Meeks had concluded that Mrs. LaRoche was driving too fast for conditions. However, Dr. Cummings calculates that she was driving 53.6 miles per hour. There is no posted speed limit near the tracks. While Trooper Meeks's may have believed that Mrs. LaRoche was driving too fast for conditions, this does not necessarily mean that she was driving

AO 72A
(Rev. 8/82)

so fast that she was unable to safely stop the vehicle before reaching the nearest rail of the crossing. Defendant has pointed to no evidence in the record that identifies what this speed would be. As such, a reasonable juror could conclude that Mrs. LaRoche was not in violation of Georgia Code section 40-6-140(c) when she traversed the crossing.

It is not plain, palpable and undisputed that Ms. LaRoche could have avoided the accident by the use of ordinary care, that she had successfully navigated the crossing once before, or that she was not traveling at a "reasonable and prudent speed" when she traversed the crossing. Based on the evidence, reasonable minds could reach different conclusions as to these questions, and they should thus be determined by a jury. McCray, 661 S.E.2d at 695.

### c. Defendant's Duty to Warn

The parties dispute whether Defendant had a duty to warn Mrs. LaRoche of the dangerous condition at the crossing.

The Georgia Code of Public Transportation ("GCPT") provides a set of "uniform regulations as to signs, signals, markings, and other traffic-control devices." See Ga. Code Ann. § 32-6-50. Under this statute, counties and municipalities are responsible for signage and devices that warn motorists of an at-grade railroad crossing. Id. § 32-6-50(c)(1). The railroad company itself must "erect and maintain a railroad crossbuck sign on its right of way at all such crossings." Id. Section 32-6-51 makes it unlawful for any person, except for the governing authorities of counties and municipalities, to erect or maintain traffic signs except when authorized or required by law. See § 32-6-51(a). The Northern District of Georgia has observed that "the common law duty for a railroad company to initiate the installation of protective devices at grade crossings on public roads has been abrogated by the GCPT." Bentley v. CSX Transp., Inc., 437 F. Supp. 2d 1327, 1331 (N.D. Ga. 2006).

AO 72A
(Rev. 8/82)

Plaintiff concedes that the GPCT abrogated any common law duty to warn that CSXT may have had, but argues that this does not dispose of CSXT's responsibility and duty "to warn Brantley County and other municipal authorities that it was aware of and in fact had created a dangerous condition at the crossing." Plaintiff cites no authority for this proposition. Thus, at this stage of the litigation, it does not appear that CSXT had a duty to warn anyone about the railroad crossing or its inherent dangers through signage or safety devices in addition to erecting the statutorily required crossbuck sign. This is not to say, of course, that CSXT did not have a duty to design and maintain the crossing in a safe condition.

## II.    Punitive Damages

In Georgia, "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1(b). Mere negligence is not enough to support a punitive damages award. "There must be circumstances of aggravation or outrage." Lindsey v. Clinch Cnty. Glass, Inc., 718 S.E.2d 806, 807 (Ga. Ct. App. 2011). One such circumstance may be "conscious indifference to consequences." Baumann v. Snider, 532 S.E.2d 468, 474 (Ga. Ct. App. 2000). The imposition of punitive damages is a question for the jury. Id.

Punitive damages are not available in a wrongful death action. Roseberry v. Brooks, 461 S.E.2d 262, 267 (Ga. Ct. App. 1995). The measure of recovery for the wrongful death of a spouse is "the full value of the life of the decedent, as shown by the evidence." Ga. Code Ann. § 51-4-2. This amount does not include an estate's claim for the decedent's pain and suffering, which is a distinct cause of action. See Grant v. Ga. Pac. Corp., 521 S.E.2d 868, 870 (Ga. Ct.

App. 1999). A recovery on the value of a life is penal because "it is not necessarily related to the 'real value to the person in whom the cause of action is vested. . . . To hold that the jury can award additional exemplary damages under [former Civil Code (1910) § 4503, now OCGA § 51-12-5.1] would have the effect of imposing . . . a double penalty." Roseberry, 461 S.E.2d at 267 (quoting Engle v. Finch, 139 S.E. 868, 869 (Ga. 1927)) (editorial changes in original). See generally Sackman v. Balfour Beatty Cmtys., No. CV 113-066, 2014 WL 4415938, *18 (S.D. Ga. Sept. 8, 2014) (concluding that punitive damages are not available in Georgia for wrongful death claims, but are available in connection with the injuries, pain, and suffering of the deceased "as part of a pre-death tort claim of the decedent.").

Recovery for pain and suffering is not permitted where there is no evidence that the decedent exhibited consciousness of pain. Grant, 521 S.E.2d at 870. However, physical injury need not precede mental pain and suffering to justify an award. Monk v. Dial, 441 S.E.2d 857, 859 (Ga. Ct. App. 1994). In Monk, the decedent had been driving a truck at a great speed when it collided with a tractor-trailer, and the evidence showed that the decedent died instantly. Nevertheless, the Georgia Court of Appeals held that there was evidence to support a verdict and judgment on pain and suffering because there was evidence that the decedent's vehicle veered shortly before the collusion. From this, the jury could infer that the deceased was "aware of the impending crash, and from these circumstances could extrapolate the probable mental state of decedent in that last moment of consciousness. The fright, shock, and mental suffering experienced by an individual due to wrongful acts of negligence will authorize a recovery where attended with physical injury." Id.

Plaintiff has presented evidence that Mrs. LaRoche's pre-death injuries may warrant punitive damages. As the Court has already found, Johns' affidavit could support a finding that

AO 72A
(Rev. 8/82)

Defendant was wanton and consciously indifferent to the potentially dangerous consequences of the ramp in refusing to adequately maintain the road in a safe condition. Also, Plaintiff's Statement of Material Facts alleges that Mrs. LaRoche "lost control of the truck, became airborne, lost consciousness, landed forcefully, crashed into a tree some 785 feet down the road, and died shortly thereafter." Pl.'s SOF ¶ 15. Defendant argues that the fact that Mrs. LaRoche "lost consciousness" before striking the tree precludes a finding of pre-death pain and suffering here. Plaintiff's own statement of fact on this issue seems to misstate Dr. Cummings' conclusion that Mrs. LaRoche lost consciousness upon impact with the road. But regardless of whether Mrs. LaRoche lost consciousness before landing on the road or upon impact, the fact that Mrs. LaRoche lost consciousness *after* being launched in the air could suggest that she suffered consciousness of imminent death or injury, and could thus support an award for punitive damages. The evidence of Mrs. LaRoche's pain and suffering is significant enough to send this question to the jury.

## CONCLUSION

As discussed in the appendix below, Plaintiff's evidence is riddled with inadmissible statements of fact. However, shining among the dross are material questions of fact that require the Court to **DENY** Defendant's Motion for Summary Judgment (Dkt. no. 47).

**SO ORDERED**, this 3RD day of September, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

I.    **Defendant's Objections to Plaintiff's Proffered Evidence and Statement of Materials Facts**

Plaintiff filed several affidavits to support his opposition to Defendant's Motion for Summary Judgment. Particularly, Plaintiff filed affidavits by former Waycross Paving Company Randy Johns (Dkt. no. 61), professional engineer Augustine F. Ubaldi (Dkt. no. 65), professional engineer Alford C. Amos (Dkt. no. 63), and biomechanical engineer Jeremy Cummings (Dkt. no. 64). Defendant, in turn, objected to portions of each of these affidavits. See Dkt. nos. 71, 72, 73, and 74, respectively. Plaintiff responded to each of these objections in one filing. See Dkt. no. 80.

a.    **Defendant's Objections (Dkt. no. 71) to Randy Johns' Affidavit (Dkt. no. 61)**

¶ 38: Defendant objects to Randy Johns' statement that he informed Mr. Ambrose, the CSX Roadmaster for the Trudie Road crossing, of a dangerous ramp effect at the crossing and that "Mr. Ambrose stated, in substance, that he understood the danger that the ramp posed to motorists." Defendant objects because Johns is a lay witness and has failed to state specifically what Ambrose said. Defendant cites generally Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 701, but provides no other authority or argument as to its objection. The objection is **OVERRULED** because relaying an opposing party statement is appropriate testimony for a lay witness.

¶¶ 40, 41, 49: Defendant objects to Johns' statement that the amount of asphalt Ambrose approved Waycross Paving to use at the Trudie Road crossing in 2000 "was not . . . enough additional asphalt/blacktop to eliminate the steep and dangerous ramp effect," and that the crossing remained unsafe for motorists despite the additional asphalt Ambrose approved. Johns draws similar conclusions for work done at the crossing in 2009. Defendant's objections are

**SUSTAINED** because such conclusions are based on scientific, technical, or other specialized knowledge within the scope Rule 702, and Plaintiff has failed to lay the appropriate foundation for such testimony. Fed. R. Evid. 701(c), 702.

¶ **51:** Defendant objects to Johns' statement that he observed at the Trudie Road crossing several gouge marks in the pavement that were caused by either motor vehicles having gone airborne over the crossing or coming down hard after traveling over the crossing because of the dangerous ramp effect. Defendant argues that Johns, as a lay witness, is not qualified to offer such testimony. Defendant's objection is **OVERRULED in part and SUSTAINED in part**; Johns' statement that he saw gouge marks at the Trudie Road crossing is appropriate testimony for a lay witness as it was rationally based on his perception, and Defendant's objection is overruled as to this statement. However, Johns' conclusion that the gouge marks were caused by airborne vehicles or the dangerous ramp effect, without any accompanying statement that he had actually seen an airborne vehicle gouge the crossing, is based on specialized knowledge or is otherwise speculative, and is thus not appropriate testimony for a lay witness. Defendant's objections to this portion of the statement, then, are sustained.

¶¶ **54-58, 60-62:** Johns compares the Trudie Road crossing to other crossings he had worked on in Georgia, Florida, Alabama and South Carolina. From these comparisons, he concludes that the Trudie Road crossing is the most dangerous of the "500 plus" other crossings he had worked on because of the steep ramp effect. Johns further states that the "ramp effect" at the crossing is dangerous because there is no warning about this effect and motorists are generally unable to appreciate or perceive the danger. Johns' evaluation of the danger of a specific crossing relative to hundreds of others throughout the southeast is based on his technical

AO 72A
(Rev. 8/82)

and specialized knowledge, and is not appropriate testimony for a lay witness. See Fed. R. Evid. 701(c). Defendant's objections to these statements are **SUSTAINED.**

### b. Defendant's Objections to the Expert Affidavits

Plaintiff's witnesses Alford Amos, Jeremy Cummings, and Augustine Ubaldi offer expert opinion testimony in their affidavits. See Dkt. nos. 63, 64, 65. For ease of ruling on these objections, the Court will first discuss certain principles of the law concerning expert testimony before applying these principles to Defendants' various objections.

An expert affidavit opposing a motion for summary judgment must set forth specific facts in order to create an issue of fact for trial, and conclusory allegations without specific supporting facts in an affidavit have no probative value. Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985). "The evidence presented cannot consist of conclusory allegations or legal conclusions." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Specifically, expert opinions in an affidavit cannot merely be "conclusory statements designed to have legally operative effects" or "implicate issues that are solely within the purview of the court and . . . not the proper subject of evidentiary submissions." Griffin v. City of Clanton, Ala., 932 F. Supp. 1357, 1358 (M.D. Ala. 1996).

As an initial matter, the Court notes that certain sections in two of Plaintiff's expert affidavits appear to be nothing more than response briefs dressed up as expert affidavits. Defendant objects that many of Plaintiff's experts' statements are conclusory and designed to have a legally operative effect. Plaintiff's experts Augustine Ubaldi and Jeremy Cummings devote a substantial portion of their affidavits simply to deconstructing Defendant's legal arguments in its Motion for Summary Judgment (Dkt. no. 48), as opposed to supporting assertions of fact or addressing Defendant's asserted facts.

As discussed in their affidavits, and as further indicated by the various letters following their names such as "Ph.D." and "P.E.," Ubaldi and Cummings are qualified to discuss various aspects of the underlying facts of the accident, including the crossing maintenance, construction, and the human factors that contributed to the accident. However, absence of a "J.D." or "Esq." behind their names disqualifies them from replying to Defendant's legal arguments—that is a task best left to Plaintiffs' counsel.

Defendant objects to most of Dr. Cummings' statements addressing its brief in support of its Motion for Summary Judgment, including: **¶¶ 32, 33, 35, 38, 44, 47, 48, 53-63, 68-70**. These statements, which were included in a section of the affidavit under the overly-candid heading "CSXT Motion," clearly invade the province of the Court and are designed to have a legal effect. For example, Dr. Cummings states that Defendants' legal conclusions "are simply not supported by the facts of this case" and that its argument "misses the point" or "ignores" certain facts. Dr. Cummings even goes so far as to call Defendant's arguments "disingenuous." Such arguments belong in response briefs, not expert affidavits. These arguments are calculated to have a legal effect, and Defendant's objections to them are **SUSTAINED**.

Likewise, Defendant objects to similar statements in Ubaldi's affidavit, including: **¶¶ 62, 63, 67, 68, 79-81, 85, 86**. These statements include interpretations of Georgia statutes, respond to Defendant's arguments by stating what those arguments "ignore," and even argue against Defendant's *hypothetical* arguments (e.g., "If CSXT were to argue . . ."). They are designed to have a legal effect, and Defendant's objections to these statements are **SUSTAINED**.

### i. Defendant's Objections (Dkt. no. 72) to the Affidavit of Augustine Ubaldi (Dkt. no. 65)

**¶ 23:** Ubaldi discussed the effects of maintenance on a track's elevation. Specifically, Ubaldi opined that the occasional resurfacing of a track can cause the track to be raised several

AO 72A
(Rev. 8/82)

inches "in comparison to when it was originally constructed." In his affidavit, Ubaldi also states that CSXT "should have obviously been aware" of this fact. Defendant's objection to these statements is **OVERRULED in part and SUSTAINED in part**. Defendant's objection to the statement that resurfacing a track can elevate it several inches is **OVERRULED,** as this is proper expert witness testimony. However, Defendant's objection to Ubaldi's speculation that CSXT "should have obviously been aware" of this fact is **SUSTAINED**, as that conclusion is not based on sufficient facts or data and appears to be designed to have a legally operative effect.

¶¶ **39, 54, 58, 65, 72, 77, 78:** Ubaldi states that, having read CSXT's policies and instructions, along with certain Georgia DOT policies, he believes that CSXT's 2009 resurfacing work at the Trudie Road crossing variously "*required*," (emphasis in original), placed CSXT "under a duty," "mandated," or placed CSXT under an "obligation" to correct the roadway so that it was not more than three inches higher or lower than the top of the nearest rail at a point 30 feet from the rail, pursuant to CSXT's own instructions to its employees. The legal effect of these policies on CSXT is beyond the province of an expert witness, and Defendant's objections to these statements are **SUSTAINED**.

¶ **70:** Ubaldi states that Spatafore's belief that it would not be practical to lessen the grade at the Trudie Road Crossing "would suggest to me that Mr. Spatafore recognized that Trudie Road and the crossing was neither safe nor in compliance with MWI 901-05." Such an inferential leap is neither based on Ubaldi's expertise nor helpful to the triers of fact, who can decide on their own what Mr. Spatafore's statements "suggest" about his understanding of Trudie Road's safety. Defendant's objection to this statement is **SUSTAINED**.

¶ **61:** While this paragraph directly responds to CSXT's motion, it does so simply by re-asserting a proper statement of expert opinion. It does not purport to educate the reader on any

legal deficiency in Defendant's brief, and Defendant's objection to this paragraph is **OVERRULED**.

¶¶ **29, 30, 33, 34, 43, 46, 53, 55-57, 71, 74, 76, 82, 84:** Defendant objects to several of Ubaldi's statements in which he opines on the safety of an uneven surface at the crossing, the Trudie Road crossing's condition on the date of the accident, the practicality of restoring the crossing to a "safe" condition, and the purpose CSXT's policies regarding the grade of a crossing. Ubaldi also restates some of Mr. Spatafore's deposition testimony. Defendant objects that the opinions about the condition of the Trudy Road crossing are immaterial, which is simply false. Furthermore, Ubaldi's references to Mr. Spatafore's statements are not inaccurate. Therefore, Defendant's objections to these statements are **OVERRULED**.

### ii. Defendant's Objections (Dkt. no. 73) to the Affidavit of Alfred Amos (Dkt. no. 63)

Plaintiffs hired Alfred Amos to offer his expert opinion as an engineer on the roadway approach at the Trudie Road crossing.

¶¶ **30, 68, 69:** Defendant objects to Amos's opinions that certain statutory and regulatory standards apply to railroad crossings, and that Defendant's failure to meet these standards was "negligent" or imposed a duty on CSXT to repair the Trudie Road crossing. These statements are designed to have a legally operative effect, and Defendant's objections to them are **SUSTAINED**.

¶ **52:** Amos opines that Defendant "knew or should have known" that a dangerous condition existed at the Trudie Road crossing. This statement is conclusory, and Defendant's objection to it is **SUSTAINED**.

¶¶ **32, 38, 42, 43, 45, 48, 58, 63-65, 67:** Amos discussed how resurfacing a railroad crossing can create a "ramp effect," and opined that the Trudie Road crossing had such a feature

AO 72A
(Rev. 8/82)

at the time of the accident. He also discussed industry and CSXT standards for railroad

crossings, and stated that the condition of the Trudie Road crossing did not meet these standards.

Mere interpretation and application of technical regulations (as opposed to the legal conclusions

drawn from that application), is not beyond the province of an expert witness, and Defendant's

objections to these statements are **OVERRULED**.

### iii. Defendant's Objections (Dkt. no. 74) to the Affidavit of Jeremy Cummings (Dkt. no. 64)

Plaintiffs retained Jeremy Cummings, a biomedical engineer, to perform an accident

reconstruction, biomechanical analysis, and human factors analysis of the accident.

**¶¶ 36, 37, 41-43, 45, 46, 49-51, 67, 71:** Interspersed throughout Dr. Cummings' response

to Defendant's Motion are pure statements of opinion that Dr. Cummings derived solely from his

examination of the data based on his expertise. These statements, standing alone, do not refer to

Defendant's Motion and are the proper subject for an expert witness's opinions. Defendant's

objections to these statements, then, are **OVERRULED.**

**¶¶ 15, 21, 24-27, 29, 30:** Before his response to Defendant's Motion for Summary

Judgment, Dr. Cummings discusses his analysis and findings regarding the accident. Particularly,

he concludes that the Trudie Road crossing was the proximate cause of Mrs. LaRoche's loss of

control of the vehicle she was driving. He also states that, from a "human factors" perspective,

Mrs. LaRoche's "violation of expectation" contributed to the accident because she did not expect

to encounter a precipitous ramp at the crossing. While his opinion that the Trudie Road crossing

proximately caused Mrs. LaRoche's accident skirts close to an "ultimate issue," there is "some

reliable factual basis upon which the opinions of plaintiffs' experts are premised," and it is thus

admissible. Fed. R. Evid. 704; Smith v. Ortho Pharm. Corp., 770 F. Supp. 1561, 1573 (N.D. Ga.

1991). The other statements are based upon the application of his scientific expertise to the

underlying facts and data, and are appropriate opinions for an expert under Rule 702.

Defendant's objections to these statements are **OVERRULED**.

## II. Defendant's Objections (Dkt. no. 70) to Plaintiff's Statement of Material Facts (Dkt. no. 60)

Defendant objects to many of Plaintiff's statements of material fact because "[n]umerous paragraphs in the Affidavits that Plaintiff cites to support his Statement of Material Facts are not based on personal knowledge, do not set forth facts that would be admissible in evidence, and are conclusory opinions which often are designed to have legally operative effects." Dkt. no. 70, p. 1. Plaintiff agrees that most of Defendant's objections are based solely on Defendant's objections to the four affidavits. Dkt. no. 80, p. 7. Because the Court has already sifted through the various objections to the affidavits, the Court will consider Plaintiff's statement of material facts to the extent they are not based on affidavit statements for which Defendant's objections were sustained.